## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) ANTHONY P. TUFARO, D.D.S.,<br>M.D., F.A.C.S., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) | Case No. CIV-2020-1138-J |
| (1) STATE OF OKLAHOMA, ex rel.<br>THE BOARD of REGENTS for the<br>UNIVERSITY of OKLAHOMA, | ) ) ) ) ) | |
| (2) JASON R. SANDERS, M.D., MBA, in his<br>individual capacity and his official capacity<br>as the Senior Vice President and Provost, | ) ) ) ) ) | |
| (3) JOHN P. ZUBIALDE, M.D., in his individual<br>capacity and his official Capacity as the<br>Executive Dean of the College of Medicine, | ) ) ) ) | |
| (4) STEVEN M. SULLIVAN, D.D.S., F.A.C.S.,<br>F.A.C.D., in his individual Capacity and<br>his official capacity as Chair of the<br>Department of Surgical Sciences; | ) ) ) ) ) | |
| (5) KEVIN S. SMITH, D.D.S., in his<br>individual capacity only, | ) ) ) | |
| (6) PAUL S. TIWANA, D.D.S., in his<br>individual capacity only, | ) ) ) | |
| (7) BARISH H. EDIL, M.D., F.A.C.S., in his<br>individual capacity and his official capacity<br>as the Chair of the Departmentof Surgery, | ) ) ) ) | |
| Defendants. | ) | |

## PLAINTIFF'S COMBINED RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................iv-ix

Factual Allegations in the Complaint ................................................................. 1

    A.    Dr. Tufaro's journey to OU ........................................................... 1

    B.    The terms of Dr. Tufaro's employment ...................................... 2

    C.    Beginning in December, 2018, Dr. Tufaro discovered and spoke out about significant malfeasance by Defendants Sullivan, Smith and Tiwana .......... 3

    D.    Dr. Tufaro reported other public concern issues ........................................... 4

    E.    Defendants moved quickly to retaliate against Dr. Tufaro resulting in his termination................................................................................................ 4

    F.    Defendants campaign against Dr. Tufaro continued after termination ......... 5

ARGUMENT AND AUTHORITIES ................................................................. 6

**Proposition I:** OU is not entitled to sovereign immunity.................................................. 6

**Proposition II:** A government official sued in his/her individual capacity is entitled to qualified immunity at the motion to dismiss stage only if the well pleaded facts cannot establish a constitutional violation that was clearly established at the time of the action .................................................................................................................... 7

**Proposition III:** Dr. Tufaro alleges in Count I that the OU Board of Regents, in their official capacity, and Dr. Zubialde, Dr. Edil, Dr. Sullivan and Dr. Sanders in their individual and official capacities, terminated Dr. Tufaro in retaliation for exercising his right of free speech on matters of public concern. He properly seeks injunctive relief from the OU Board of Regents and the Official Capacity Defendants, including reinstatement. He further properly seeks monetary damages against Defendants Zubialde, Edil, Sullivan and Sanders for the same violation in their individual capacities .................................................................................................................... 8

    A.    General elements of a First Amendment claim........................................... 8

    B.    The conduct of Defendants Edil, Sanders, Zubialde, and Sullivan is the product of retaliatory animus because of Dr. Tufaro's speech. Defendants

i

cannot individually extract themselves from the animus unless that Defendant performed an independent investigation.................................... 10

C.    The Complaint pleads in painstaking detail that Dr. Tufaro's constitutionally protected speech was a motivating factor in his termination................................................................................. 12

    1.    Dr. Tufaro's speech is constitutionally protected (element 2)......... 12

    2.    Dr. Tufaro's termination was motivated by retaliation for his constitutionally protected speech (element 4)................................. 13

**Proposition IV:** Count III of the Complaint alleges that the OU Board of Regents, in their official capacity, and Defendants Zubialde, Edil, Sullivan and Sanders, in their individual and official capacities, took Dr. Tufaro's property interest in continued employment without providing him due process. Dr. Tufaro properly seeks injunctive relief against the OU Board of Regents and these individual Defendants in their official capacities, to include a hearing and reinstatement. Dr. Tufaro also properly seeks money damages against these individual Defendants in their individual capacities .................... 15

**Proposition V:** Count X alleges the OU Board of Regents, in their official capacities, and all individual Defendants, in their official capacities, owe Dr. Tufaro a name clearing hearing because his termination affects his good name and reputation. Dr. Tufaro is further entitled to money damages against the individual Defendants in their individual capacities for their conduct in damaging Dr. Tufaro's constitutionally protected liberty interest without due process.................................................................. 17

**Proposition VI:** Dr. Tufaro's protected Constitutional rights to free speech, procedural due process, and liberty were clearly established when his termination was announced . 19

    A.    It is clearly established that State employers are prohibited from terminating an employee because of the employee's protected speech...... 20

    B.    It is clearly established that the University Defendants were required to provide Dr. Tufaro notice and an opportunity to be heard before terminating his employment...................................................................... 21

    C.    It is clearly established that the University Defendants were required to provide Dr. Tufaro a name-clearing hearing when they articulated his termination was due to "subpar" performance ............................................ 22

**Proposition VII:** Count II of the Complaint properly alleges all elements of a state law claim against OU for breach of his consecutive term employment contract.............. 22

ii

**Proposition VIII:** Count IV of the Complaint alleges a state law claim that all of the individual Defendants tortiously interfered with Dr. Tufaro's business relationship with OU. Defendants Sullivan, Smith and Tiwana, did not directly address this claim in their respective motions. The law is clear that an employee can tortiously interfere with another employee's contract with the same employer ...................................................... 25

**Proposition IX:** Count V correctly alleges a state law claim that the individual Defendants were engaged in a civil conspiracy to deprive Dr. Tufaro of his employment with OU for tortious purposes ........................................................................................... 27

**Proposition X:** Count VI(A) alleges a state law claim that Defendants OU, Zubialde, Edil, Sullivan, and Sanders terminated Dr. Tufaro in retaliation for his exercise of free speech in violation of Art. 2, § 22, of the Oklahoma Constitution. No Defendant addressed this claim in their respective motions to dismiss. No Defendant is entitled to any immunity on this state law claim ............................................................................... 27

**Proposition XI:** Count VI(B) alleges a state law claim that OU's termination of Dr. Tufaro violated Oklahoma public policy. Dr. Tufaro was speaking out against government wrongdoing and violations of federal and state law which Oklahoma recognizes as consistent with public policy. Dr. Tufaro's contract meets the definition of employee-at-will............................................................................................................. 29

CONCLUSION ............................................................................................................. 30

CERTIFICATE OF SERVICE ...................................................................................... 31

OK 564251.1

# TABLE OF AUTHORITIES

## CASES

*Anderson v. McCotter*,
100 F.3d 723 (10th Cir. 1996) ............................................................. 20

*Baca v. Sklar*,
398 F.3d 1210 (10th Cir. 2005) ........................................................... 13

*Baptiste v. J.C. Penney Co., Inc.*,
147 F.3d 1252 (10th Cir. 1998) ............................................................. 8

*Barrios v. Haskell County Public Facilities Auth.*,
2018 OK 90, 432 P.3d 233 .................................................................. 28

*Bd. of Regents v. Roth*,
408 U.S. 564 (1972) ............................................................................ 15

*Behrens v. Pelletier*,
516 U.S. 200 (1996) .............................................................................. 7

*Bishop v. Wood*,
426 U.S. 593 (1972) ..................................................................... 16, 18

*Bjorklund v. Miller*,
467 Fed.Appx. 758 (10th Cir 2102) ........................................... 18, 19, 22

*Brock v. Thompson*,
1997 OK 127, 948 P.3d 279 ................................................................ 27

*Brokers' Choice of America, Inc. v. NBC Universal*,
861 F.3d 1081 (10th Cir. 2017) ........................................................... 24

*Brown v. Montoya*,
662 F.3d 1152 (10th Cir. 2011) ............................................................. 8

*Burk v. K-Mart Cor.*,
1989 OK 22, 770 P.3d 24 ........................................................ 1, 28, 29, 30

*Casey v. West Las Vegas Ind. Sch. Dist.*,
473 F.3d 1323 (10th Cir. 2007) ........................................................... 21

iv

*Cleveland Bd. of Educ. v. Laudermill,*
    470 U.S. 532 (1985) ........................................................................................ 16

*Codd v. Velger,*
    429 U.S. 624 (1977) ........................................................................................ 18

*Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.,*
    527 U.S. 666 (1999) .......................................................................................... 6

*Comprehensive Addition Treatment Ctr. v. Leslea,*
    552 Fed.Appx. 812 (10th Cir. 2014) ............................................................ 19

*Conaway v. Smith,*
    853 F.2d 789 (10th Cir.1988) ........................................................................ 13

*Connick v. Myers,*
    461 U.S. 138 (1983) .................................................................................... 9, 10

*Dill v. City of Edmond,*
    155 F.3d 1193 (10th Cir.1998) ...................................................................... 15

*Dixon v. Bhuiyan,*
    2000 OK 56, 10 P.3d 888 .......................................................................... 16, 23

*Ex parte Young,*
    209 U.S. 123 (1908) .......................................................................................... 6

*Fisher Sand & Gravel, Co. v. Giron,*
    465 Fed.Appx 774 (10th Cir. 2012) ......................................................... 15, 16

*Florafax Intern. Inc. v. GTE Market Resources, Inc.,*
    1997 OK 7, 933 P.3d 282 .............................................................................. 24

*Garcetti v. Ceballos,*
    547 U.S. 410 (2006) ..................................................................................... 9, 21

*Hall v. O'Keefe,*
    1980 OK 108, 617 P.2d 196 ........................................................................... 21

*Harlow v. Fitzgerald,*
    457 U.S. 800 (1982) .......................................................................................... 7

*Hedquist v. Beamer,*
    763 Fed.Appx. 705 (10th Cir. 2019) ....................................................................... 13

*Helget v. City of Hays, Ks.,*
    844 F.3d 1216 (10th Cir. 2017) .............................................................................. 20

*Hulen v. Yates,*
    322 F.3d 1229 (10th Cir. 2003) ........................................................................ 13, 16

*In re Initiative Petition No. 366,*
    2002 OK 21, 46 P.3d 123 ...................................................................................... 28

*Jordan v. Dillon Companies,*
    618 Fed.Appx. 926 (10th Cir. 2015) ....................................................................... 11

*Kingsford v. Salt Lake City Sch. Dist.,*
    247 F.3d 1123 (10th Cir. 2002) .............................................................................. 22

*Klein v. Univ. of Kansas Med. Ctr.,*
    975 F.Supp. 1408 (D.Kan. 1997) .............................................................................. 6

*Lane v. Franks,*
    573 U.S. 228 (2014) .............................................................................................. 20

*Lann v. Hill,*
    436 F.Supp. 463 (W.D. Okla. 1977) ....................................................................... 29

*Lapides v. Bd. of Regents of the Univ. Sys. of Ga.,*
    535 U.S. 613 (2002) ................................................................................................ 6

*Lybrook v. Members of Farmington Mun. Sch. Bd. Of Educ.,*
    232 F.3d 1334 (10th Cir. 2000) ............................................................................ 7, 8

*Maestas v. Segura,*
    416 F.3d 1182 (10th Cir. 2005) ........................................................................ 13, 14

*Marrow Development Corp. v. American Bank and Trust Co.,*
    1994 OK 26, 875 P.3d 411 ...................................................................................... 25

*Martin v. Johnson,*
    1998 OK 127, 975 P.2d 889 .............................................................................. 25, 26

vi

*McBeth v. Himes*,
598 F.3d 708 (10th Cir. 2010) ................................................................ 19

*Meiners v. Univ. of Kan.*,
359 F.3d 1222 (10th Cir. 2004) ................................................................ 6

*Melton v. City of Oklahoma City*,
928 F.2d 920 (10th Cir. 1991) ................................................................ 18

*Miller v. Ind. Sch. Dist. No. 56 of Garfield Cty.*,
1980 OK 19, 609 P.2d 756 ................................................................ 16

*Moore v. Guthrie*,
438 F.3d 1036 (10th Cir. 2006) ................................................................ 7

*Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*,
429 U.S. 274 (1977) ................................................................ 13

*Murphy v. Spring*,
58 F.Supp.3d 1241 (N.D. Okla. 2014) ................................................................ 28

*Muscogee (Creek) Nation v. Pruitt*,
669 F.3d 1159 (10th Cir. 2012) ................................................................ 6

*Paradis v. Montrose Memorial Hosp.*,
157 F.3d 815 (10th Cir. 1998) ................................................................ 20

*Patrick v. Miller*,
953 F3d 1240 (10th Cir. 1992) ................................................................ 21

*Paul v. Davis*,
424 U.S. 693 (1976) ................................................................ 18

*Payne v. Kerns*,
2020 OK 31, 467 P.3d 659 ................................................................ 28

*Pellegrino v. State ex rel. Cameron University*,
2003 OK 2, 63 P.3d 535 ................................................................ 26

*Perry v. Sindermann*,
408 U.S. 593 (1972) ................................................................ 21, 22

OK 564251.1

*Peterson v. Jensen,*
    371 F.3d 1199 (10th Cir. 2004) ................................................................ 7

*Pickering v. Board of Education,*
    391 U.S. 563 (1968) .............................................................. 9, 13, 20

*Pierce v. Gilchrist,*
    359 F.3d 1279 (10th Cir. 2004) ........................................................... 20

*Ruiz v. McDonnell,*
    299 F.3d 1173 (10th Cir. 2002) ........................................................... 24

*Russell v. Bd. of Cnty. Comm'rs,*
    1997 OK 80, 952 P.2d 492 .................................................................. 16

*Singh v. Cordle,*
    936 F.3d 1022 (10th Cir. 2019) ........................................................... 10

*Staub v. Proctor Hosp.,*
    562 U.S. 411 (2011) ........................................................................... 11

*Sutton v. Utah State Sch. For Deaf & Blind,*
    173 F.3d 1226 (10th Cir. 1999) ............................................................. 7

*Thomas v. City of Blanchard,*
    548 F.3d 1317 (10th Cir. 2008) ........................................................... 21

*Thomas v. Kaven,*
    765 F.3d 1183 (10th Cir. 2014) ............................................................. 7

*Tonkovich v. Kan. Bd. of Regents,*
    159 F.3d 504 (10th Cir. 1998) ............................................................. 16

*Trant v. Oklahoma,*
    754 F.3d 1158 (10th Cir. 2014) ......................................................... 8, 13

*Vinyard v. King,*
    728 F.2d 428 (10th Cir. 1984) ............................................................. 16

*Watson v. Univ. of Utah Med. Ctr.,*
    75 F.3d 569 (10th Cir. 1996) .............................................................. 15

OK 564251.1

*Wisconsin v. Constantineau*,
    400 U.S. 433 (1971) ........................................................................................ 22

*Workman v. Jordan*,
    32 F.3d 475 (10th Cir. 1994) ........................................................................ 18

## STATUTES, RULES AND OTHER AUTHORITY

42 U.S.C. § 1983 ................................................................................................. 7

51 O.S. § 153(B) ............................................................................................... 28

Fed.R.Civ.P. 8(d)(3) ......................................................................................... 29

Oklahoma Constitution Art. 2 §22 ............................................................. 27, 28

OUJI 21.11 ........................................................................................................ 24

Dr. Anthony P. Tufaro came to OU after an accomplished twenty six year career at Johns Hopkins. The 119 paragraphs and eight[1] causes of action in the Complaint[2] provide a detailed account of Dr. Tufaro's termination from OU because of his speech on matters of public concern involving serious financial, ethical, and legal malfeasance by Defendants, including Drs. Sullivan, Smith, and Tiwana (collectively "Oral Surgeons"). Knowing the prohibited reason caused Dr. Tufaro's termination, and contrary to OU's own policy, Defendants have never disclosed to Dr. Tufaro the reason for his termination, which alone suggests Defendants have something to hide. Defendants have compounded the harm by publicizing their pretextual reason, claiming Dr. Tufaro's performance was "subpar," thereby smearing his good name.

Defendants' motions to dismiss (Docs. 5, 6, and 7) ignore the Complaint's well pleaded facts and merely make perfunctory statements of the law with little connection to the Complaint. The motions are meritless and should be denied.

## Factual Allegations in the Complaint

**A. Dr. Tufaro's journey to OU.** Before joining the University of Oklahoma ("OU") medical faculty in September 2017 (Doc. 1-3, ¶ 21), Dr. Tufaro enjoyed a long, distinguished career at Johns Hopkins in Baltimore. *Id.*, ¶ 16. He holds both an M.D. and a D.D.S., and is board certified in plastic surgery and in oral and maxillofacial surgery. *Id.*

---

[1] The heading between paragraphs 102 and 103 was inadvertently omitted. The heading should have alleged the *Burk* tort against only OU as Count VII. This Brief will refer to the state constitutional claim as Count VI(A) and the *Burk* tort claim as Count VI(B).

[2] Dr. Tufaro filed his "Petition" in Oklahoma County, Oklahoma. Defendant Sullivan, with the consent of all other Defendants, including the Regents, removed. As the matter is now in federal court, Dr. Tufaro will refer to the initial pleading as his "Complaint."

1

Dr. Tufaro's practice is vast, including major reconstruction of the chest and abdominal walls, head and neck surgical oncology, management of soft tissue cancers, skin cancer treatment including melanoma, and craniofacial surgery and reconstruction. *Id.*

In early 2017, OU began recruiting Dr. Tufaro to serve as a Professor of Surgery and Chief of Plastic Surgery. *Id.*, ¶ 18. OU's recruitment effort culminated in a March 23, 2017, offer to Dr. Tufaro to become a "consecutive term" member of the OU faculty, which Dr. Tufaro accepted on April 30, 2017. *Id.*, ¶¶ 18-19. The terms of employment were memorialized in a contract signed by OU on September 15, 2017, and Dr. Tufaro on October 3, 2017 ("Contract"). *Id.*, ¶ 21. The OU Health Science Center Faculty Handbook ("Faculty Handbook") further defines the terms of Dr. Tufaro's employment. *Id.*

**B. The terms of Dr. Tufaro's employment.** The Contract provides that "Full-time faculty who hold a regular faculty title as assistant professor or above and who are ineligible for tenure shall be eligible for renewal consecutive term appointments with no restriction placed on the number of terms that may be served." *Id.* The Faculty Handbook further provides that such appointments are "automatically renewed" each fiscal year "unless notification of non-renewal or termination is given in accordance with Section 3.2.7[.]" *Id.*, ¶ 22. It further provides that any member of the faculty who is terminated "must be informed in writing of the basis for the action[.]" It specifies the possible reasons bases termination. *Id.*, ¶¶ 26-27. The Contract terms and the Faculty Handbook required Defendants to provide Dr. Tufaro a valid reason for termination (¶ 43) and gave him "a reasonable expectation of continued employment" (¶ 44). "OU routinely renews similar appointments unless there is a just basis to terminate the appointment." *Id.*, ¶ 67.  Dr. Tufaro

2

"had a property right in his continued employment[.]" *Id.*, ¶ 50.

The Faculty Handbook, § 3.2.7, requires OU to provide Dr. Tufaro at least 180 day's notice before a termination becomes effective and to state a basis for the termination. *Id.*, ¶¶ 22, 25. Defendants' refusal to disclose to Dr. Tufaro any reason for his termination prevented him from administratively appealing the termination[3] and deprived him of his right to due process.

**C.      Beginning in December, 2018, Dr. Tufaro discovered and spoke out about significant malfeasance by Defendants Sullivan, Smith and Tiwana.** Dr. Tufaro's appointment was automatically renewed in October, 2018. *Id.*, ¶ 23. Shortly thereafter, Dr. Tufaro discovered the Oral Surgeons used "their faculty positions to funnel cash patients or patients through the Oklahoma prison system (paid for by the State) to their private practice clinic, Oral Facial Surgery Center." *Id.*, ¶ 32. In early 2019, after the renewal of his Contract, Dr. Tufaro reported to OU officials that the Oral Surgeons' conduct was "a violation of the agreement between OU and the Oklahoma prison contract, OU policy and/or Medicare/Medicaid regulations." *Id.*, ¶¶ 32, 34.

Dr. Tufaro further discovered and reported to Defendants Edil and Zubialde, as well as Dr. Roxie M. Albrecht, that the "Oral Surgeons would require patients to return to OU Medical Center after treatment was started if the private practice was no longer able to be compensated for the work." *Id.*, ¶ 33. In early 2019, Dr. Tufaro informed Drs. Edil,

---

[3] At least four of the listed potential reasons for termination, including "poor clinical performance, unprofessional behavior, or conduct that jeopardizes patient safety," permit Dr. Tufaro to appeal the termination to the Faculty Appeals Board. *Id.*, ¶¶ 27, 28.

Albrecht, and Zubialde that this practice also violated Medicare/Medicaid regulations. *Id.*

**D. Dr. Tufaro reported other public concern issues.** Dr. Tufaro also reported public

concern issues to Defendant Edil, as well as Warren Churchill and Dr. Postier. Dr. Tufaro reported

OU's "failure to record medication use as required by law and leaving a medication closet open

instead of locking it, and failing to secure medication in a safe manner." His reports included

concern regarding the "disappearance of over $16,000 worth of injectable drugs from the plastic

surgery clinic." *Id.*, ¶ 35. He spoke out about the fact that the Plastic Surgery Clinic was designed

in such a way as to force patients "to walk through in-patient rooms where other patients were

being cared for in order to get to the Plastic Surgery clinic." *Id.*, ¶ 36. He spoke out that OU allowed

residents to care for patients without an attending surgeon. *Id.*, ¶ 37. All of Dr. Tufaro's speech

occurred in the six month period between his contract automatically renewing in October, 2018,

and notification of his termination on May 14, 2019. *Id.*, ¶¶ 34-37.

**Defendants' motions failed to address any of the averments mentioned in
sections C and D herein.** These are key allegations.

**E. Defendants moved swiftly to retaliate against Dr. Tufaro, resulting in his
termination.** Dr. Tufaro's reports of malfeasance began in late fall 2018 and continued

into spring 2019. On March 26, 2019, during the exact time he was speaking out, Dr. Tufaro

received a negative performance evaluation – "the first in his exemplary and impressive

career." *Id.*, ¶ 38. Worse, after Dr. Tufaro received evaluation, Edil modified it to include

a requirement that Dr. Tufaro "improve relationships with the School of Dentistry,"

including the Oral Surgeons. *Id.*, ¶ 39. Dean Raymond A. Cohlmia, who runs the School

of Dentistry, "told Dr. Tufaro after reading Dr. Tufaro's reports regarding the Oral

OK 564251.1

Surgeons, that he would fire Dr. Tufaro for the reports." *Id.*, ¶¶ 34, 39. Defendant Edil "advised Dr. Tufaro at the time that the Oral Surgeons are 'vicious' people and ran the School of Dentistry." *Id.*, ¶ 40.

Shortly thereafter, on or about May 14, 2019, while he continued to speak out, Dr. Tufaro was notified he was being terminated. *Id.*, ¶¶ 24, 41. "Dr. Tufaro was terminated as a result of his speaking out about the Oral Surgeons' malfeasance and complaint about HIPPA violations and other matters of public concern." *Id.*, ¶ 45. The termination occurred "because the Oral Surgeons wanted Dr. Tufaro removed from OU's faculty to cover up their wrongdoing …. [and] was in retaliation for Dr. Tufaro's reporting of their malfeasance." *Id.*, ¶ 46. The fact that Defendants have still provided no explanation to Dr. Tufaro for the termination serves to bolster his assertions.

**F. Defendants campaign against Dr. Tufaro continued after termination.** Dr. Tufaro secured other employment at the Department of Veterans Affairs hospital located within the OU campus. His supervisor is Dr. Suhair Maquisi, acting Chief of Plastic Surgery. *Id.*, ¶ 47. OU personnel told Dr. Maquisi that OU would not allow OU residents to work with Dr. Tufaro at the VA or at OU because "Dr. Tufaro's conduct at OU was subpar." *Id.*, ¶ 47-48. This fact is significant for three reasons: (1) OU has provided no basis for Dr. Tufaro's termination, let alone evidence his conduct was "subpar;" (2) if the reason for the termination is because his conduct was "subpar," OU was required by § 3.16(b) to afford Dr. Tufaro the right to appeal his termination to the Faculty Appeals Board; and (3) calling a distinguished physician "subpar" smears Dr. Tufaro's good name and reputation and forecloses opportunities for future employment. *Id.*, ¶¶ 27-28, 108-109.

5

## ARGUMENT AND AUTHORITIES

### Proposition I

### OU is not entitled to sovereign immunity.

Defendants allege in passing that the University is entitled to Eleventh Amendment immunity in relation to Dr. Tufaro's request for relief – focusing only on the claim for monetary damages. But Dr. Tufaro's Complaint asks only for "injunctive relief, including reinstatement, against OU and the Official Capacity Defendants … (in their official capacity)." Doc. 1-3, ¶ 62 (Free speech retaliation); ¶ 79 (Procedural due process); and ¶ 116 (Liberty Interest). While state institutions may possess Eleventh Amendment immunity, it is not absolute. *See generally Lapides v. Bd. of Regents of the Univ. Sys. of Ga.,* 535 U.S. 613 (2002); *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666 (1999). Three exceptions exist: (1) a state's consent to suit in federal court, (2) Congress' abrogation of a state's sovereign immunity by appropriate legislation, and (3) application of the doctrine set forth in *Ex parte Young,* 209 U.S. 123 (1908). *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1166 (10th Cir. 2012).

Reinstatement of employment is a form of prospective equitable relief that is within the doctrine of *Ex parte Young. Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1232 (10th Cir. 2004); *see also Klein v. Univ. of Kansas Med. Ctr.,* 975 F.Supp. 1408, 1416 (D.Kan. 1997) (Eleventh Amendment does not bar suit against a state agency that seeks prospective relief of reinstatement). The Complaint clearly seeks reinstatement as equitable relief for his constitutional claims. Sovereign immunity does not insulate OU or the University Defendants in their official capacities.

<u>**Proposition II**</u>

**A government official sued in his/her individual capacity is entitled to qualified immunity at the motion to dismiss stage only if the well pleaded facts cannot establish a constitutional violation that was clearly established at the time of the action.**

Dr. Tufaro alleges in Counts I (First Amendment Retaliation), III (Procedural Due Process), and VII (Liberty Interest) that certain Defendants violated his constitutional protections to speak on matters of public concern and his right to due process (pre- and post-termination). These constitutional deprivations are actionable under 42 U.S.C. § 1983.

Qualified immunity shields government actors from § 1983 liability only if their actions either do not violate a statutory or constitutional right or if the violation was not "clearly established" at the time of the challenged conduct. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). When qualified immunity is raised in a motion to dismiss, "all well-pleaded factual allegations in the … complaint are acceded as true and viewed in the light most favorable to the nonmoving party." *Moore v. Guthrie*, 438 F.3d 1036, 1039 (10th Cir. 2006) (quoting *Sutton v. Utah State Sch. For Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999)). At the motion to dismiss stage, defendants face "a more challenging standard of review than would apply on summary judgment." *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (quoting *Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004)). The Court only scrutinizes defendants' conduct as alleged in the Complaint for "objective legal reasonableness." *Behrens v. Pelletier*, 516 U.S. 200, 309 (1996).

Thus, once qualified immunity is raised in a motion to dismiss, the plaintiff has the burden in the complaint to come "forward with sufficient facts to show that the defendant's actions violated a federal constitutional or statutory right." *Lybrook v. Members of*

*Farmington Mun. Sch. Bd. Of Educ.*, 232 F.3d 1334, 1337 (10th Cir. 2000) (quoting

*Baptiste v. J.C. Penney Co., Inc.*, 147 F.3d 1252, 1255 (10th Cir. 1998)). The determination

of whether any government actor is entitled to qualified immunity is a question of law for

the Court. *Brown v. Montoya*, 662 F.3d 1152, 1162 (10th Cir. 2011).

As is spelled out in the Complaint and the propositions below, each of the individual

defendants violated Dr. Tufaro's clearly established right to be free from retaliation for

speaking out on matters of public concern. Prop. III discusses First Amendment

Retaliation, Prop. IV discusses procedural due process, and Prop. V discusses liberty

interest due process. Of course, qualified immunity requires the Court to analyze whether

these rights were clearly established at the point when Defendants acted to deprive Dr.

Tufaro of these rights – which is addressed in Prop. VI. The remaining propositions VII-

XI address Dr. Tufaro's state law claims.

## Proposition III

**Dr. Tufaro alleges in Count I that the OU Board of Regents, in their official capacity, and Dr. Zubialde, Dr. Edil, Dr. Sullivan and Dr. Sanders in their individual and official capacities, terminated Dr. Tufaro in retaliation for exercising his right of free speech on matters of public concern. He properly seeks injunctive relief from the OU Board of Regents and the Official Capacity Defendants, including reinstatement. He further properly seeks monetary damages against Defendants Zubialde, Edil, Sullivan and Sanders for the same violation in their individual capacities.**

### A.  General elements of a First Amendment claim.

To establish First Amendment retaliation, the Complaint must identify

constitutionally protected speech that led the identified Defendants to retaliate against the

plaintiff. Dr. Tufaro has plainly identified allegations supportive of his claims. *Trant v.*

*Oklahoma*, 754 F.3d 1158, 1165 (10th Cir. 2014). Yet Defendants end their legal analysis

8

of Dr. Tufaro's First Amendment claim by simply asserting "qualified immunity" - as if they those words ends the inquiry.  Doc. 6, pgs. 5-6. But that, of course, does not suffice. Dr. Tufaro alleged facts sufficient to state a claim for First Amendment retaliation and which, if true, show that competent persons would know that what Defendants did violated Dr Tufaro's rights to defeat qualified immunity. First, however, Dr. Tufaro must establish an entitled to First Amendment protection.

"It is well settled that 'a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.'" *Garcetti v. Ceballos*, 547 U.S. 410, 413 (2006) (quoting *Connick v. Myers*, 461 U.S. 138, 142 (1983). "The First Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens." *Id.* at 419. "[P]ublic employees do not surrender all their First Amendment rights by reason of their employment." *Id.* at 417.

To be sure, the State, as an employer, has an interest "in promoting the efficiency of the public services it performs through its employees." *Id.* (quoting *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968)). However, the Court also recognized that "[s]o long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Id.* at 419 (citing *Connick*, 461 U.S. at 147).

The balance between the interests of the employee and the State is often referred to as the *Pickering* Balance. A Court evaluates five elements in First Amendment retaliation claims: "(1) whether the speech was made pursuant to an employee's official duties; (2)

whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct." *Singh v. Cordle*, 936 F.3d 1022, 1034 (10th Cir. 2019). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147.

University Defendants' Motion (Doc. 6)[4] **only addresses** whether Dr. Tufaro's speech is "constitutionally protected" (assumed to be element 2) and whether "a nexus between the speech and any alleged act of retaliation" (element 4) exists. Doc. 6, at 6. They concede the speech was not part of Dr. Tufaro's official duties (element 1), Defendants' interest in promoting efficient government service does not outweigh Dr. Tufaro's free speech rights (element 3), and that Defendants would not have terminated Dr. Tufaro in the absence of his speech (element 5).

Dr. Tufaro will address the fact that the Complaint establishes all necessary elements in Prop. III(C), but first Dr. Tufaro must address these Defendants' incorrect effort to require Dr. Tufaro to have individually alleged each Defendants' conduct.

**B. The conduct of Defendants Edil, Sanders, Zubialde, and Sullivan is the product of retaliatory animus because of Dr. Tufaro's speech. Defendants cannot individually extract themselves from the animus unless that Defendant performed an independent investigation.**

---

[4] The "University Defendants" refers to Defendants Sanders, Zubialde, Edil and Sullivan and is the reference given them by these Defendants in their Motion to Dismiss (Doc. 6).

10

The University Defendants' half-hearted attempt to parse the specific conduct alleged against them fails. The University Defendants argue that "none of the facts alleged by Plaintiff arise to a violation of Plaintiff's constitutional rights." *See* Doc. 6, at 6. Defendants futilely ignore the many instances of protected speech the Complaint sets forth.

Defendants have not questioned Dr. Tufaro's allegation that his speech "was a substantial or motivating factor in the decision to terminate" his employment or that they "used their positions under color of state law to deprive Dr. Tufaro of his free speech rights." Doc. 1-3, ¶¶ 55, 56 and 58. Instead of addressing these clearly pleaded allegations, the University Defendants hope to avoid liability by questioning the specific allegations against each individual Defendant. Doc. 6, pgs. 6-8. But legally, all these Defendants are liable under the "cat's paw" or "subordinate bias" analysis. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 419-20 (2011) (An "aggregation of animus and adverse action" by multiple actors can be attributed to all decision makers "if the adverse action is the intended consequence" of less than all of the actors.); *Jordan v. Dillon Companies*, 618 Fed.Appx. 926, 928-29 (10th Cir. 2015) ("[A]nimus may be imputed to a neutral decisionmaker under a 'subordinate bias' theory if (1) a supervisor performed an act motivated by animus that was intended to cause an adverse employment action, and (2) the act was a proximate cause of the adverse employment action.").

The Complaint provides ample evidence that Dr. Tufaro's termination was caused by retaliatory animus for his speech. *See* Prop. III(C)(2) below. Further, no University Defendant conducted an independent investigation before signing off on the termination. Thus, it is irrelevant whether anyone of the individual Defendants engaged in specific

11

retaliatory conduct only that it was motivated or tainted by animus.

### C. The Complaint pleads in painstaking detail that Dr. Tufaro's constitutionally protected speech was a motivating factor in his termination.

1. Dr. Tufaro's speech is constitutionally protected (element 2).

There is no question Dr. Tufaro engaged in constitutionally protected speech. The Complaint establishes several specific examples of Dr. Tufaro's reporting of corruption, improprieties, and other malfeasance on the part of the Oral Surgeons and other individuals. And these are only instances of malfeasance currently known by Dr. Tufaro.

Dr. Tufaro reported that the Oral Surgeons were using "their faculty positions to funnel cash patients or patients through the Oklahoma prison system (paid for by the State) to their private practice clinic, Oral Facial Surgery Center." *Id.*, ¶¶ 32, 34. He further reported that the "Oral Surgeons would require patients to return to OU Medical Center after treatment was started if the private practice was no longer able to be compensated for the work." *Id.*, ¶ 33. In addition, he reported OU's "failure to record medication use as required by law and leaving a medication closet open instead of locking it, and failing to secure medication in a safe manner," including the "disappearance of over $16,000 worth of injectable drugs from the plastic surgery clinic." *Id.*, ¶ 35. He further spoke out about the fact that the Plastic Surgery Clinic was designed in such a way as to force patients "to walk through in-patient rooms where other patients were being cared for in order to get to the Plastic Surgery clinic." *Id.*, ¶ 36. In the late fall, 2018, he spoke out about OU allowing residents to care for patients without an attending surgeon. *Id.*, ¶ 37.

"Speech which discloses any evidence of corruption, impropriety, or other

12

malfeasance on the part of [state] officials, in terms of content, clearly concerns matters of public import." *Hulen v. Yates*, 322 F.3d 1229, 1237 (10th Cir. 2003) (quoting *Conaway v. Smith,* 853 F.2d 789, 796 (10th Cir.1988)). Dr. Tufaro's speaking out about "corruption, impropriety, or other malfeasance" by the Oral Surgeons is constitutionally protected.

> 2. <u>Dr. Tufaro's termination was motivated by retaliation for his constitutionally protected speech (element 4).</u>

To establish a connection between protected speech and the adverse action, Dr. Tufaro must allege either direct or circumstantial evidence that his speech was a "substantial" or "motivating" factor for the termination. *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Maestas v. Segura*, 416 F.3d 1182, 1188 (10th Cir. 2005). The Complaint must allege his speech is linked to the employer's action. *Id.*

When the defendants know about the speech, "close proximity" between the speech and the adverse action warrants an inference of retaliatory motive. *Maestas,* 416 F.3d at 1189 (citing *Baca v. Sklar,* 398 F.3d 1210, 1221 (10th Cir. 2005)). "Other evidence of causation may include evidence the employer expressed opposition to the employee's speech … or evidence the speech implicated the employer in serious misconduct or wrongdoing." *Id.* Unlike the first three elements of the *Pickering* Balance, the "motivation prong is a factual issue typically decided by a jury." *Hedquist v. Beamer,* 763 Fed.Appx. 705, 712 (10th Cir. 2019) (citing *Trant*, 754 F.3 at 1165).

The Complaint includes ample and specific evidence Dr. Tufaro's termination was motivated by retaliation for his speech. Because the speech "implicated the employer in serious misconduct or wrongdoing," *Maestas* requires the Court to infer retaliatory motive.

13

But the Complaint goes further. Dr. Tufaro explained OU and several of the Defendants "expressed opposition" to his speech. After reading Dr. Tufaro's reports regarding the Oral Surgeons, the Dental School Dean Cohlmia told Dr. Tufaro that he would fire him for the reports. Doc. 1-3, ¶ 3). Instead of stopping the malfeasance, Edil ordered Dr. Tufaro to "improve relationships with the School of Dentistry," including the Oral Surgeons, the subjects of many of his complaints of malfeasance. Doc. 1-3, ¶ 39. Edil also told him that "the Oral Surgeons are 'vicious' people and ran the School of Dentistry." Doc. 1-3, ¶ 40. Knowing how vicious these people were, Edil did nothing to protect Dr. Tufaro, but instead enjoined him to "find a way to work with the Oral Surgeons." *Id.* This shows Defendants "expressed opposition" to Dr. Tufaro's speech, which *Maestas* also finds sufficient.

The Complaint goes even further, identifying the close proximity between the speech and the adverse employment action as well as Defendants' knowledge of the speech. Defendants cannot, and do not, argue that they were unaware of Dr. Tufaro's speech as it was expressed to many of them directly, (Doc. 1-3, ¶¶ 34-37), between late 2018 and the spring of 2019. Doc. 1-3, ¶¶ 34-38. The first adverse action – the negative performance evaluation – took place on March 26, 2019. Doc. 1-3, ¶¶ 38-39. Just a few weeks later, on May 14, 2019, Dr. Tufaro was notified of his termination. Doc. 1-3, ¶ 41.

Defendants' utter refusal to provide any explanation for Dr. Tufaro's termination is further evidence his termination was the result of his protected speech.  Dr. Tufaro is an exceptional surgeon with an impressive pedigree. OU went to great expense and effort to recruit Dr. Tufaro from Johns Hopkins. Yet, Dr. Tufaro reported malfeasance, Defendants terminated him without giving him the reasons for his non-renewal as required by the

14

Contract and the Faculty Handbook. The inference from this failure strongly points the prohibited reason as the actual motivation. On a motion to dismiss, the Court must accept this inference in favor of the plaintiff. The Complaint more than adequately pleads the allegations needed for the motions to dismiss to be denied.

## Proposition IV

**Count III of the Complaint alleges that the OU Board of Regents, in their official capacity, and Defendants Zubialde, Edil, Sullivan and Sanders, in their individual and official capacities, took Dr. Tufaro's property interest in continued employment without providing him due process. Dr. Tufaro properly seeks injunctive relief against the OU Board of Regents and these individual Defendants in their official capacities, to include a hearing and reinstatement. Dr. Tufaro also properly seeks money damages against these individual Defendants in their individual capacities.**

In Count III, Dr. Tufaro alleges he had a property interest in his continued employment. "Procedural due process claims require a two-part analysis. First, [the Court must] assess whether Plaintiff's interest was protected by the Fourteenth Amendment, and if so, whether Plaintiff was afforded an appropriate level of process.". Because it is clear that Dr. Tufaro was not afforded any process, Defendants focus only on the first-part – whether Dr. Tufaro had a property interest.

This Court must look to state law to determine whether Dr. Tufaro had a constitutionally protected property interest. *Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569, 577 (10th Cir. 1996). "[P]roperty interests … are not created by the Constitution but rather … by existing rules or understandings that stem from an independent source such as state law." *Fisher Sand & Gravel, Co. v. Giron*, 465 Fed.Appx 774, 779 (10th Cir. 2012) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). "Valid contracts may constitute a property interest for purposes of due process." *Id.* at 779-80.

15

OK 564251.1

Property interests include the right to continued employment. *Cleveland Bd. of Educ. v. Laudermill,* 470 U.S. 532, 538-39 (1985); *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 517 (10th Cir. 1998). Moreover, the right to continued employment can be established by implied-in-fact terms in a contract. *Vinyard v. King,* 728 F.2d 428, 431 (10th Cir. 1984) ("Mutually explicit understandings can create a property interest in continued employment by means of an implied contract.") (citing *Bishop v. Wood,* 426 U.S. 593, 601 (1972)). Further, "substantive restrictions" on the employer in an employment agreement and/or in the custom and practice of the employer can also serve as protected property interests. *Hulen v. Yates,* 322 F.3d at 1241.

Under Oklahoma law, an employment contract includes the promises made in the written contract itself and "all such implied provisions as are indispensable to effectuate the intention of the parties, and arise from the language of the contract and the circumstances under with it was made." *Miller v. Ind. Sch. Dist. No. 56 of Garfield Cty.*, 1980 OK 19, ¶ 11, 609 P.2d 756, 758-59. The implied-in-fact terms "encompasses all provisions – discernible from the circumstances under which the agreement was reached – which are indispensable to effectuate the parties' intentions." *Id.* A Faculty Handbook can create terms of the implied contract. *Russell v. Bd. of Cnty. Comm'rs,* 1997 OK 80, ¶ 23, 952 P.2d 492, 501-02. The implied terms of a contract "is a factually intensive question." *Dixon v. Bhuiyan*, 2000 OK 56, ¶ 12, 10 P.3d 888, 891-92; *Russell,* ¶ 23, 502.

Defendants assert dismissal is required because the Faculty Handbook allows OU to refuse to renew the consecutive term employment upon a timely notice. Doc. 6, pgs. 8-9. However, Defendants ignore several significant allegations in the Complaint. Dr. Tufaro

16

OK 564251.1

was employed on a 12 month "consecutive term" appointment. Doc. 1-3, ¶ 20. While he did not have full academic tenure, the terms of this appointment provided Dr. Tufaro significant assurances of continued employment absent justifiable reason for termination. For example, the written terms of the Contract provide that Dr. Tufaro "shall be eligible for renewal consecutive term appointments with no restriction placed on the number of terms that may be served" and that he could attain academic tenure in the future. *Id.*, ¶ 21.

The Faculty Handbook provides guarantees Dr. Tufaro would not be terminated unless good cause existed. "Consecutive term appointments are automatically renewed for the next fiscal year unless notification of non-renewal is given[.]" *Id.*, ¶ 22. Notification must include in writing the reason for the non-renewal and must state one of the reasons enumerated in § 3.16.1. *Id.*, ¶ 25-26. At his appointment, Dr. Tufaro was assured "OU routinely renews similar appointments unless there is a just basis for terminating the appointment." *Id.*, ¶ 67. Thus, Dr. Tufaro "had a reasonable expectation of continued employment based on his Contract and the provisions in the Faculty Handbook." *Id.*, ¶ 71.

## **Proposition V**

**Count X alleges the OU Board of Regents, in their official capacities, and all individual Defendants, in their official capacities, owe Dr. Tufaro a name clearing hearing because his termination affects his good name and reputation. Dr. Tufaro is further entitled to money damages against the individual Defendants in their individual capacities for their conduct in damaging Dr. Tufaro's constitutionally protected liberty interest without due process.**

The Complaint includes evidence the termination was in retaliation for Dr. Tufaro's speech. Although Defendants have not officially explained to him why they terminated his employment, OU officials have given others a pretextual reason for terminating him –

17

claiming his conduct at OU was "subpar." Doc. 1-3, ¶¶ 47-48. OU told Dr. Tufaro's current employer, the VA, and Dr. Tufaro personally that OU would not allow its Residents to work with Dr. Tufaro either at the VA or at OU (where Dr. Tufaro still enjoys privileges). *Id.* at ¶ 47. These comments and actions cast Dr. Tufaro in a light "that might seriously damage [his] standing or associations in the [medical] community and foreclose [his] freedom to take advantage of future employment opportunities[.]" *Melton v. City of Oklahoma City*, 928 F.2d 920, 927 (10th Cir. 1991). Publication of these statements give rise to a liberty interest claim against these Defendants. *Id.*

To be actionable, the disparaging statement must be disclosed publically. *Bishop v. Wood*, 426 U.S. 341, 348 (1976). Further, the statement must be false. *Codd v. Velger,* 429 U.S. 624 (1977). "There must be some factual dispute between an employer and a discharged employee which has some significant bearing on the employee's reputation." *Id.* at 627. Finally, the false statement must accompany the termination or foreclose other employment opportunities. *Paul v. Davis*, 424 U.S. 693, 710 (1976); *Workman v. Jordan*, 32 F.3d 475, 481 (10th Cir. 1994).

Defendants argue Dr. Tufaro did not meet any of the elements required for a liberty interest claim. Doc. 6, pg. 10. Apparently, Defendants do not believe calling a distinguished physician "subpar" or refusing to allow its residents to work with him can seriously damage his reputation in the medical community. *Melton, supra.* Defendants also argue the statements did not occur in the course of the termination. But, the Tenth Circuit has found a liberty interest claim is made with a post-termination disclosure. *Bjorklund v. Miller,* 467 Fed.Appx. 758, 767-68 (10th Cir 2102). "Publication of defamatory statements need not be

18

strictly contemporaneous with a termination to occur in the course of the termination of employment." *Id.* at 768.

Further, the fact that Dr. Tufaro asserts his termination is retaliation for his speech does not foreclose his liberty interest claim in having to explain the pretextual reasons being given by Defendants. *Id.* at 769. Now that it is out, Dr. Tufaro has to explain his termination from OU to potential employers which has rendered him unable to secure comparable employment. Doc. 1-3, ¶¶ 113, 117 ("Dr. Tufaro has been harmed by loss of his reputation [and] … continues to be economically injured[.]").[5] Dr. Tufaro's liberty interest claim is well pleaded and not subject to dismissal.

### Proposition VI

**Dr. Tufaro's protected Constitutional rights to free speech, procedural due process, and liberty were clearly established when his termination was announced.**

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation." *Comprehensive Addition Treatment Ctr. v. Leslea*, 552 Fed.Appx. 812, 815-16 (10th Cir. 2014) (quoting *McBeth v. Himes*, 598 F.3d 708, 716 (10th Cir. 2010)). "Ordinarily, in order for the law to be clearly established, there must be a relevant Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other circuits must have found the law to be as the plaintiff maintains, ... such that existing precedent has placed the statutory or constitutional question

---

[5] Defendants point to the fact that Dr. Tufaro found other employment. (Doc. 6, pg. 10). This does not mean, as Defendants imply, that employment opportunities have not been foreclosed.

beyond debate." *Id.* at 816 (internal citations omitted). "The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Id.* (quoting *Pierce v. Gilchrist,* 359 F.3d 1279, 1298 (10th Cir.2004)).

### A. It is clearly established that State employers are prohibited from terminating an employee because of the employee's protected speech.

State employers have known – at least since the *Pickering* decision in 1968 – that they cannot terminate employees because of their protected speech. The Tenth Circuit on numerous occasions have explained to state actors that they cannot terminate employees for their exercise of their right to speak on matters of public concern. *Anderson v. McCotter*, 100 F.3d 723, 729 (10th Cir. 1996) ("The law has been clearly established since 1968 that public employees may not be discharged in retaliation for speaking on matters of public concern, absent a showing that the government employer's interest in the efficiency of its operations outweighs the employee's interest in the speech.") (citations omitted). "[T]he Supreme Court 'has cautioned time and again that public employers may not condition employment on the relinquishment of constitutional rights.'" *Helget v. City of Hays, Ks.,* 844 F.3d 1216, 1221 (10th Cir. 2017) (quoting *Lane v. Franks,* 573 U.S. 228, 236 (2014). *See* also *Paradis v. Montrose Memorial Hosp.*, 157 F.3d 815, 819 (10th Cir. 1998) (Nurses constructively discharged "after speaking to hospital administrations about appellant Doerer's allegedly unethical and illegal conduct" found to have violated clearly established First Amendment protection.). In the Tenth Circuit, it "has long been established law … that when a public employee speaks as a citizen on matters of public concern to outside

20

entities despite the absence of any job-related reason to do so, the employer may not take

retaliatory action." *Thomas v. City of Blanchard*, 548 F.3d 1317, 1328 (10th Cir. 2008)

(quoting *Casey v. West Las Vegas Ind. Sch. Dist.*, 473 F.3d 1323, 1333-34 (10th Cir. 2007).[6]

Free speech is especially clearly established in academic settings even if the

professor is not tenured, like Dr. Tufaro here. *See e.g., Perry v. Sindermann,* 408 U.S. 593,

597-89 (1972).

### B. It is clearly established that the University Defendants were required to provide Dr. Tufaro notice and an opportunity to be heard before terminating his employment.

"Oklahoma law recognizes 'the terms of employment established by an employer

… may create a sufficient expectancy of continued employment to constitute a property

interest, which must be afforded constitutionally guaranteed due process." *Patrick v.

Miller*, 953 F3d 1240, 1244 (10th Cir. 1992) (quoting *Hall v. O'Keefe*, 1980 OK 108, ¶ 9,

617 P.2d 196, 200). When the employment contract provides specific reasons for

termination, "Oklahoma courts would not allow [government] officials to alter those terms

so as to expand their authority to the determinant of employees." *Patrick v. Miller*, 953

F.2d at 1244.[7] The Faculty Handbook specified the reasons Dr. Tufaro could be terminated.

Silence was not one of them. Like the employees in *Patrick*, Dr. Tufaro had "a legitimate

expectation of continued employment to the extent that [the Faculty Handbook] limits its

---

[6] The fact that Dr. Tufaro spoke to OU personnel and not an "outside entity" is of no moment. *Garcetti*, 547 U.S. at 421 ("Employees in some cases may receive First Amendment protection for expressions made at work.")

[7] *Patrick* involved the City of Tulsa, but there is no reason the Faculty Handbook should be treated differently than the City Charter.

officials' power to terminate such employment." *Id.* at 1245. Further, it "is well established that an implied-in-fact contract is a source of state law that can potentially create an expectation of continued employment." *Kingsford v. Salt Lake City Sch. Dist.*, 247 F.3d 1123, 1132 (10th Cir. 2002) (citing *Perry v. Sindermann*, 408 U.S. 593, 601-02 (1972).

### C. It is clearly established that the University Defendants were required to provide Dr. Tufaro a name-clearing hearing when they articulated his termination was due to "subpar" performance.

"Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971). Since at least 2012, the Tenth Circuit has found it clearly established that post-termination statements that implicate liberty interests, even if not the reasons given during the termination, give rise to a liberty interest claim. *Bjorklund v. Miller,* 467 Fed.Appx. at 769. The supervisor there told the newspaper **after the termination** that the employee perjured himself during the pre-determination hearing. The fact that the employee then had to explain and defend against the false charge constituted a deprivation of liberty. *Id.*

### Proposition VII

**Count II of the Complaint properly alleges all elements of a state law claim against OU for breach of his consecutive term employment contract.**

As Dr. Tufaro explained in Prop. IV, Dr. Tufaro had a reasonable expectation of continued employment unless a just cause reason existed for his termination. When looking at implied terms, "the Court will consider (a) the parties' acts, conduct and statements as a whole, (b) whether there was a meeting of the minds on the agreement's essential elements,

22

(c) the parties' intent to enter into a contract upon defined terms, and (d) whether one of the parties has relied in good faith upon the alleged contract." *Dixon*, 2000 OK 56, ¶ 10, 10 P.3d at 891.

OU's argument the Complaint does not allege a breach of contract because OU "followed the terms of the contract," (Doc. 5, pg. 5), is specious. To get there, OU cites portions the Complaint while ignoring others. OU points out that ¶¶ 21, 22, 24 and 25 of the Complaint outline that OU provided the 180 day notice for non-renewals as required by § 3.2.7(b) of the Faculty Handbook. *Id.* But OU ignores the other relevant paragraphs. For example, OU ignores that it "routinely renews similar appointments unless there is a just basis for terminated the appointment." *Id.*, ¶ 67. This fact led Dr. Tufaro to believe he "had a reasonable expectation of continued employment." *Id.*, ¶ 44. These assertions alone at the motion to dismiss phase confirm the expressed and implied terms of the employment contract between Dr. Tufaro and OU required a just reason for his termination.

OU also ignores it was contractually required to provide the basis for any non-renewal for one of the reasons enumerated in § 3.16.1. Doc. 1-3, ¶ 25. The "Faculty Handbook requires that 'A faculty member against who the imposition of … termination of employment … must be informed in writing of the basis for the action.'" *Id.*, ¶ 26. Notification of the reason for termination is an extremely important contract right for Dr. Tufaro and was clearly violated. *Id.* ¶¶ 24, 25, and 41. Dr. Tufaro is entitled by the Faculty Handbook to an appeal of his termination to the Faculty Appeals Board if the termination is because of "poor clinical performance, unprofessional behavior, or conduct that

OK 564251.1

jeopardizes patient safety." *Id.*, ¶¶ 27-28.[8] Dr. Tufaro appropriately pleaded he had a contract that required a just reason for his termination. OU's failure to provide any reason is alone a breach subjecting OU to liability.

OU's argument Dr. Tufaro suffered no damages is absurd. OU first argues that the claim is for anticipated continuous employment and therefore it somehow fits into the "anticipated lost profits" discussion in *Florafax Intern. Inc. v. GTE Market Resources, Inc.*, 1997 OK 7, 933 P.3d 282. But *Florafax* did not involve breach of an employment contract which renders it meaningless here. Damages for breaches of employment contracts always include the difference between what the employee would have earned had he not been terminated and what he actually earned by mitigating his damages. *See* OUJI 21.11.

OU's assertion that Dr. Tufaro's subsequent employment at the VA means he "suffered no damages and cannot allege them," Doc. 5, pg. 5, is nonsense. As stated in the Complaint, Dr. Tufaro is not earning what he would have earned had he not been wrongfully terminated, thus is incurring damage. Doc. 1-3, ¶¶ 59, 69, 90, 96, 101 and 106.[9]

Count II, breach of contract against OU, is properly pleaded. OU's motion to

---

[8] There are three other enumerated reasons for termination in the Faculty Handbook that would have allowed Dr. Tufaro to appeal the decision to the Faculty Appeals Board, none of which could possibly apply to Dr. Tufaro. *See* Doc. 1-3, ¶ 27.

[9] These paragraphs in the Complaint do not specifically state the VA job pays less than OU. However, Dr. Tufaro is entitled to all reasonable inferences in the Complaint on a motion to dismiss. *Brokers' Choice of America, Inc. v. NBC Universal*, 861 F.3d 1081, 1105 (10th Cir. 2017 ("In ruling on a motion to dismiss for failure to state a claim, 'all well-pleaded *facts*, as distinguished from conclusory allegations, must be taken as true,' and the court must liberally construe the pleadings and make all reasonable inferences in favor of the non-moving party.") (Quoting *Ruiz v. McDonnell*, 299 F.3d 1173, 1181 (10th Cir. 2002) (emphasis original).

24

dismiss Count II is without merit.

<u>Proposition VIII</u>

**Count IV of the Complaint alleges a state law claim that all of the individual Defendants tortiously interfered with Dr. Tufaro's business relationship with OU. Defendants Sullivan, Smith and Tiwana, did not directly address this claim in their respective motions. The law is clear that an employee can tortiously interfere with another employee's contract with the same employer.**

Oklahoma has long held that an employee can tortiously interfere with another employee's contract with the same employer even if the interference is from a state employee and part of the decision making process. *Martin v. Johnson*, 1998 OK 127, ¶¶ 30-34, 975 P.2d 889. 897-98. A claim of tortious interference with a contract requires the plaintiff to plead: (1) a business or contractual right with which there was interference; (2) the interference was malicious and wrongful; (3) the interference was neither justified, privileged nor excusable; and, (4) damages proximately resulted from the interference. *Marrow Development Corp. v. American Bank and Trust Co.*, 1994 OK 26, ¶ 10, 875 P.3d 411, 416. Sanders, Zubialde, Sullivan, and Edil allege they cannot be held liable for their tortious interference, either officially or individually, because they allege they were acting within the scope of their employment when they engaged in the tortious interference. Doc. 6, pgs. 12-13.[10] These assertions ignore clear Oklahoma law.

---

[10] Dr. Tufaro notes that he also sued Defendants Smith and Tiwana for tortious interference. (Doc. 1-3, ¶¶ 81-91). Neither Defendant sought dismissal of this Count in their Motion to Dismiss. *See* Doc. 7. The Complaint clearly included them in the definition of "Oral Surgeons" in the Complaint, *See* Doc. 1-3, ¶ 10, and thus in Count IV. Doc. 1-3, ¶ 84. Regardless, for the same reasons as Defendant Sullivan, who did seek dismissal and who is also included in the definition of "Oral Surgeons," Defendants Smith and Tiwana are not entitled to dismissal of Count III. The same is true with respect to Count V (Civil Conspiracy).

Two Oklahoma Supreme Court cases squarely address this issue. In *Martin v. Johnson,* the court held a corporate officer's interference with the employer's contract with an employee is tortious and actionable if the interference was in bad faith. 1998 OK 127, ¶ 31, 975 P.2d at 896-97 ("If an employee acts in bad faith and contrary to the interests of the employer in tampering with a third party's contract with the employer we can divine no reason that the employee should be exempt from a tort claim for interference with contract."). Moreover, the Oklahoma Supreme Court rejected the notion that governmental tort immunity might apply to protect state actors like the Defendants here. *Pellegrino v. State ex rel. Cameron University,* 2003 OK 2, 63 P.3d 535.

In *Pellegrino*, the decision maker argued he should be dismissed from any liability for tortious interference because no notice of tort claim was filed by the plaintiffs. *Id.* at ¶ 3, 536. The certified question from the Western District asked whether the fact that the offending actor was outside the scope of his employment removed the matter from Oklahoma's Governmental Tort Claims Act ("OGTCA"). Dr. Tufaro clearly alleges the Oral Surgeons and the University Defendants were "acting outside the scope of their employment" when they "tortiously caused OU to terminate its Contract with Dr. Tufaro." Neither the Western District nor the Oklahoma Supreme Court had any trouble finding the allegations of tortious interference fall outside the protections of the OGTCA. *Pellegrino*, 2003 OK 2, ¶ 6, 63 P.3d at 537. Defendants' motion must be denied.

26

## Proposition IX

**Count V correctly alleges a state law claim that the individual Defendants were engaged in a civil conspiracy to deprive Dr. Tufaro of his employment with OU for tortious purposes.**

"A civil conspiracy consists of a combination of two or more persons to do an unlawful act, or to do a lawful act by unlawful means." *Brock v. Thompson,* 1997 OK 127, ¶ 39, 948 P.3d 279, 294. While not a stand-alone tort, civil conspiracy serves to enlarge the pool of defendants against whom Dr. Tufaro may recover for the underlying torts.

Dr. Tufaro alleges that Sullivan, Smith, Tiwana, Zubialde, Edil, and Sanders "jointly conspired to cause OU to terminate [his] employment because Dr. Tufaro spoke out about matters of public concern regarding malfeasance by the Oral Surgeons." Doc. 1-3, ¶ 95. The Complaint explicitly alleges some of these Defendants were performing the unlawful acts of violating his right to free speech and tortiously interfering with his contract with OU. The Complaint further documents the unlawful means they used by refusing to provide a reason for the termination decision and retaliating against him for exercising his right to free speech. Because the claims were adequately pleaded, Count V must remain.

## Proposition X

**Count VI(A) alleges a state law claim that Defendants OU, Zubialde, Edil, Sullivan, and Sanders terminated Dr. Tufaro in retaliation for his exercise of free speech in violation of Art. 2, § 22, of the Oklahoma Constitution. No Defendant addressed this claim in their respective motions to dismiss. No Defendant is entitled to any immunity on this state law claim.**

The Oklahoma Constitution provides that every person "may freely speak, write, or publish his sentiments on all subjects, being responsible for the abuse of that right." Okla. Const. Art. 2, § 22. The Oklahoma Supreme Court finds this language provides broader

27

protection than the First Amendment of the U.S. Constitution. *In re Initiative Petition No. 366*, 2002 OK 21, ¶ 7, 46 P.3d 123, 127. Violations of the Oklahoma Constitution are actionable pursuant to the OGTCA. 51 O.S. § 153(B) ("The liability of the state … shall be exclusive and shall constitute the extent of tort liability of the state … or employees arising from common law, statute, the Oklahoma Constitution, or otherwise.").[11]

Dr. Tufaro raises this Oklahoma Constitutional claim as an alternative to his First Amendment retaliation claim and his *Burk* tort claim. Dr. Tufaro recognizes that he only has a stand-alone claim under Art. 2, § 22, if the Court were ever to find that his First Amendment claim fails for some reason. *Murphy v. Spring*, 58 F.Supp.3d 1241, 1260-61 (N.D. Okla. 2014) ("Ordinarily, this provision [Art. 2, § 22] is invoked as a public policy supporting a *Burk* tort for wrongful discharge, rather than a stand-alone claim. … In cases where the constitutional provision has been invoked as a stand-alone claim, courts have held that it may not proceed to trial simultaneously with a § 1983 First Amendment retaliation claim.") (citations omitted).

Dismissal of the Art. 2, § 22 claim at this stage is improper. It must at least await a determination on Dr. Tufaro's First Amendment and *Burk* tort claims.

---

[11] Section 155 of the OGTCA provides exceptions to state liability, none of which apply here. Thus, the discussion in *Barrios v. Haskell County Public Facilities Auth.*, 2018 OK 90, 432 P.3d 233 and more recently *Payne v. Kerns*, 2020 OK 31, 467 P.3d 659, does not apply here. Those cases found that the legislatures inclusion of exemptions in § 155 eliminated the private right of action for the different constitutional torts claimed in those case.

## Proposition XI

**Count VI(B) alleges a state law claim that OU's termination of Dr. Tufaro violated Oklahoma public policy. Dr. Tufaro was speaking out against government wrongdoing and violations of federal and state law which Oklahoma recognizes as consistent with public policy. Dr. Tufaro's contract meets the definition of employee-at-will.**

OU seeks dismissal of Dr. Tufaro's public policy *Burk* tort claim.[12] OU does not challenge the basic holding in *Burk v. K-Mart Cor.*, 1989 OK 22, 770 P.3d 24, that Dr. Tufaro's termination involved actions by him that were consistent with Oklahoma public policy. Doc. 5, pgs. 6-7. OU articulates a specific attack on the *Burk* claim arguing only that Dr. Tufaro was not an employee-at-will. *Id.*

Of course, Defendants took the exact opposite position in response to Count II (breach of contract) and Count III (property interest) in which OU and Defendants Zubialde, Edil, Sullivan, and Sanders, argued Dr. Tufaro's contract with OU could be terminated without just cause. These Defendants insist dismissal is warranted on Dr. Tufaro's property right claim and his *Burk* tort claim despite the clear law that a plaintiff can plead alternate theories. Fed.R.Civ.P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."); *Lann v. Hill*, 436 F.Supp. 463, 465 (W.D. Okla. 1977) ("Plaintiffs are entitled to state as many claims as they have regardless of inconsistencies.") Either Dr. Tufaro had a contract that required him to be terminated only for just cause such that Counts II (breach of contract) and III (due process)

---

[12] Zubialde, Edil, Sullivan, and Sanders also asked for dismissal of Dr. Tufaro's *Burk* tort. Dr. Tufaro did not sue these Defendants for this cause of action. Paragraph 105 confirms that this cause was only against OU, as OU was Dr. Tufaro's employer. Doc. 1-3, ¶ 105.

29

are appropriate, or he was an employee-at-will such that Count VI(B) is appropriate. Discovery is needed to flesh this out. Dismissal stage of the proceedings is improper.

OU asserts Dr. Tufaro met the definition of employment-at-will in its motion to dismiss, as did the individual Defendants. OU asserts the terms of the "Faculty Handbook … clearly lay out that consecutive terms appointments like that which Plaintiff had, are subject to non-renewal or termination when there is notification." Doc. 5, pgs. 4-5. Likewise, the individual Defendants assert the "terms of his contract provided that his contract would be automatically renewed *unless* he received timely notice of non-renewal." Doc. 6, pg. 9 (emphasis original). Defendants thus argue they were able to end the employment relationship at their will. This meets the definition of employment-at-will for a *Burk* tort to lie. OU's request for dismissal of Dr. Tufaro's *Burk* tort is without merit.

## CONCLUSION

Dr. Tufaro respectfully requests that the motions to dismiss be denied.

OK 564251.1

Respectfully submitted,


s/ Shannon F. Davies
Shannon F. Davies, OBA No. 13565
George S. Freedman, OBA No. 15764
Courtney D. Powell, OBA No. 19444
Spencer Fane LLP
9400 North Broadway Extension, Suite 600
Oklahoma City, Oklahoma 73114-7423
Telephone: (405) 844-9900
Facsimile:  (405) 844-9958
Email: sdavies@spencerfane.com
gfreedman@spencerfane.com
cpowell@spencerfane.com
**Attorney for Plaintiff, Dr. Anthony P. Tufaro,
D.D.S., M.D., F.A.C.S.**

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of December, 2020, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Heidi J. Long
Tina S. Ikpa
Office of Legal Counsel
University of Oklahoma
660 Parrington Oval, Suite 213
Norman, Oklahoma 73019
hlong@ou.edu
tsikpa@ou.edu
**Attorneys for Defendant State of
Oklahoma ex rel. Board of Regents
of the University of Oklahoma**

s/ Shannon F. Davies

31

OK 564251.1